IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

STEPHEN WILCOX,

     *Plaintiff*


    *v.*


U.S. DEPARTMENT OF COMMERCE                          CIVIL ACTION NO.

601 Walnut Street, #580, Philadelphia Pa 19106

And 1401 Constitution Ave. NW, Wash. DC 20230;


INVESTIGATIONS AND THREAT

MANAGEMENT SERVICE ("ITMS"),                         **Jury Trial Demanded**

A Division of

THE DEPARTMENT OF COMMERCE;


GEORGE LEE,

In his official capacity as

DIRECTOR OF THE INVESTIGATIONS AND

THREAT MANAGEMENT SERVICE AND

THE DEPARTMENT OF COMMERCE;

      And

JASON BOOKSTABER

And

TOM VALENTINE

In their official capacity as employees of

ITMS And

THE DEPARTMENT OF COMMERCE;

       *Defendants*

---

**COMPLAINT**

## COMPLAINT

Plaintiff brings this complaint for violations of Mr. Wilcox's rights and for personal injuries sustained and for economic damages against the United States Department of Commerce ("DOC"), and against Investigations and Threat Management Service ("ITMS") a Division of the DOC, Defendants George Lee, in an official capacity as Assistant Director of the Investigations and Threat Management Service; Defendants Jason Bookstaber ("Bookstaber") and Tom Valentine ("Valentine"), employees of ITMS and sued in their official capacity as employees of the U. S. Department of Commerce. Plaintiff is requesting relief under, *inter alia*, the United States Constitution and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2672.

## I.     BACKGROUND

Anticipating the DOC's denial of Plaintiff's timely filed November 2021 FTCA administrative claim, Plaintiff filed, although filed slightly prematurely, an original Amended Complaint on November 8, 2021 in the Eastern District of Pennsylvania (***Case No. 2:21-cv-04913***), to protect and toll  the Statute  of  Limitations with regard to allegations and counts  which  were  arguably nearing  a  two (2) year Statute of Limitations (*December 6, 2021*). Plaintiff received the *written denial* of Plaintiff's administrative complaint by the DOC on January 3, 2022. (See ***Exhibit 1***, attached). Defendants were served and were granted an extension to respond to the Amended Complaint for an additional 60 days, by agreement. Defendants' response to the Amended Complaint is due on or before March 14, 2022.

Plaintiff files this Complaint after discussions with Defendants' Assistant U.S. Attorney in the Amended Complaint litigation matter, wherein Counsel for both Plaintiff and Defendants were discussing the issues and anticipated possible procedural and/or jurisdictional objections to

Plaintiff's Amended Complaint. In response to Plaintiff's Counsels' discussions regarding Plaintiff filing a Second Amended Complaint to cure any possible *FTCA* jurisdictional or procedural objections and anticipated Motions, Defendants suggested, and the parties agreed, that Plaintiff file this complaint to cure any jurisdictional defect *under the FTCA*. Therefore, Plaintiff files this Complaint as more fully addressed herein and in support thereof, upon personal knowledge as well as information and belief, Plaintiff alleges the following:

## II.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under the Constitution and laws of the United States. This Court has jurisdiction to grant relief in this action pursuant to 28 U.S.C. § 1346(b) and 2672, as Plaintiff brings claims under the Federal Tort Claims Act, et al.

2.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1402(b) because the events giving rise to these claims occurred in this judicial district.

3.    Plaintiff timely filed an administrative complaint and claim under the FTCA seeking damages for injuries sustained related to this matter as further described herein, in November, 2021.

4.    By letter dated January 3, 2022, the DOC denied Plaintiff's administrative claim (See ***Exhibit 1***, attached). In the denial notification, the DOC advised Plaintiff that if he disagreed with the denial, he had the right to file suit in federal district court "*no later than six months after the date of mailing this notification*."

5.    This instant suit is timely filed under the FTCA, 28 U.S.C. § 2401(b), as it is being filed within six months of the date of the mailing of the denial of the administrative claim and All statutes of limitations on all counts herein are tolled .

6.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the Constitution and laws of the United States.

7.         Sovereign immunity for non-monetary relief is waived by 5 U.S.C. § 702, and by the fact that all  Defendants acted unconstitutionally and beyond statutory authority.

8.         Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e).

9.         The court has jurisdiction under 28 U.S.C. § 1361 because Plaintiff seeks, inter alia, writs of mandamus to compel officers and employees of the United States and its agencies to perform duties owed to Plaintiff and required under law.

## III.   PARTIES

10.        Plaintiff is a citizen of the United States and resides in the Commonwealth of Pennsylvania.

11.         Plaintiff was employed by the United States government from 1996 until 2019.

12.        Defendant U.S. Department of Commerce ("DOC") is an Executive department, 5 U.S.C. § 101, and an "agency" within the meaning of 5 U.S.C. § 701. DOC's offices are located at 601 Walnut St # 580W, Philadelphia, PA 19106 and in the District of Columbia.

13.        Defendant George Lee, who was recently terminated by the DOC post a recent Senate Investigations Report due to his illegal actions as more fully described herein, served as Director of the Defendant Investigations and Threat Management Service ("ITMS") a division of the U.S. DOC, and is sued in an official capacity.

14.        Defendants Jason Bookstaber ("Bookstaber") and Tom Valentine ("Valentine") were employees of ITMS and the Commerce Department are being sued in their official capacity.

15.        At all times relevant hereto, all Defendants, were acting within the scope of their employment with Defendants DOC and ITMS and all Defendants, acted independently and/or in concert with and/or through its servants, agents, workmen and/or employees, and/or as agents, servants, workmen and/or employees of each other when Defendants caused the injuries to Plaintiff hereinafter described.

16.         All the acts alleged to have been done or not to have been done by any or all of the

Defendants were done or not done by said Defendants, their agents, servants, and/or employees all of whom were acting within the scope of their authority with and on behalf of said Defendants.

## IV.   FACTS: NATURE OF THE ACTION

17.        Plaintiff is a career former special agent, Regional Export Control Officer (ECO), and Intelligence/Counterintelligence Officer, a career civil servant and *2018 Gold Medal* recipient the highest honorary award given by the Department, granted by the DOC Secretary, Wilbur Ross, for distinguished performance characterized by extraordinary, notable, or prestigious contributions that impact the mission of the Commerce Department.

18.        Plaintiff served the U.S. government in a sworn federal law enforcement position with fidelity, bravery, and integrity for approximately 24 years, defending the United States against enemies both foreign and domestic.

19.        Being a public servant federal agent and working with the intelligence community was Wilcox's life and all Wilcox wanted to do since Wilcox was a child.

20.        While executing the duties of his employment, Wilcox served unselfishly and was awarded numerous promotions and did many unselfish and amazing things for this country without seeking publicity or public praise for any of it.

21.        In January 1996, Wilcox joined the U.S. Air Force and served as a Russian Linguist for the National Security Agency (NSA), Ft. Meade, MD. Wilcox was honorably discharged in January 2000.

22.            In January of 2000, Wilcox took a position as an Intelligence Specialist with the Naval Information Warfare Activity (NIWA), U.S. Department of Navy, at the Suitland Federal Center, MD. In this capacity, Wilcox worked in unacknowledged, waived, Special Access Programs ("SAP").

23.            In December 2001, Wilcox took as position as special agent (civilian *1811* job series)

with the Naval Criminal Investigative Service (NCIS) stationed in the Washington, DC area.

24.         During his NCIS career, Wilcox served in the DC area and in Naples, Italy, and while assigned in Italy, Wilcox was a liaison to multiple foreign governments for Force Protection.

25.         From 2008 until 2011, NCIS assigned Wilcox as a liaison to the Russian Federal Security Service (FSB) to execute a force protection Memorandum of Understanding (MoU) between NCIS and the FSB named "Timeshare".

26.         While assigned to the Washington, DC area, Wilcox worked in counterintelligence/counterespionage and in counterproliferation undercover operations with the FBI, HSI and DCIS targeting foreign governments, terrorist organizations and organized criminal elements. After several successful cases, Wilcox was a runner up for the Department of Defense Counterintelligence Award and received an Interagency Award from the Assistant Secretary for Homeland Security.

27.         Wilcox was also trained and worked as an Intelligence Officer conducting intelligence operations and investigations for the U.S. Government.

28.         In 2012, after spending several years in Italy, Wilcox returned to the U.S. and worked with the FBI in Houston, TX in an investigation named *Bigger Game*, jointly with the Bureau of Industry and Security (BIS). The investigation resulted in the arrest of numerous Russian speaking American citizens (immigrants) who were illegally exporting microelectronics to the Russian government.

29.         At the end of 2013, Wilcox accepted a position with BIS and reported to the U.S. Embassy, Moscow, Russia as the Regional Export Control Officer (ECO).

30.         This position was to initially assist in creating a positive trade relationship with the Russian government; however, after Russia's annexation of Crimea, the position then expanded into 15 more countries in the region with the goal of conducting end-use monitoring and preventing Russia

from obtaining sensitive U.S. origin commodities for restricted uses, such as military and/or intelligence purposes.

31.        As the years progressed, his position was to visit companies in and around Russia in person, to assess what a foreign company was doing, to conduct end-use monitoring (a Congressionally mandated mission) on U.S. origin items exported from the U.S. and report information back to BIS Headquarters.

32.        As the U.S. relationship with Russia worsened, the Russian government harassed Wilcox and his family with increasing scrutiny, including hacking his bank accounts, etc., as well as conducting physical surveillance aggressively on him.

33.        He was also detained on more than one occasion by the Russian authorities for conducting the duties required of him by the Department of Commerce. This further included harassment when on travel outside of Russia. All of this was reported to each U.S. Embassies' Regional Security Offices (RSOs) accordingly and within State Department Policies.

34.        In 2015, the Deputy Chief of Mission at the U.S. Embassy recommended to the BIS Assistant Secretary David Mills and Director Kevin Kurland, Office of Enforcement Analysis, BIS, that Wilcox and his family be transferred outside of Russia.

35.        BIS then moved Wilcox to Frankfurt, Germany to start the BIS office responsible for relationships with the European Union (EU).

36.         As the BIS Export Control Officer (ECO) for U.S. Mission Russia and Germany, Wilcox was responsible for relationships with multiple foreign governments, industry associations, law firms and companies throughout 36 countries.

37.        Wilcox was the only ECO in the history of BIS ECOs to manage two ECO foreign posts concurrently as an AoR of 36 countries.

38.        During his time assigned outside the U.S., Wilcox was also requested by Kevin

Kurland and the former Deputy Secretary of Commerce (DepSec), Bruce Andrews, to act as the Personal Security Advisor (bodyguard) for DepSec Andrews while on travels to Beijing China and the Philippines to attend the Asian Pacific Exchange Conference (APEC) in 2015 and 2016.

39.     In 2018, for his contributions to investigations involving illicit Russian procurement, Wilcox was awarded a Gold Medal from U.S. Department of Commerce Secretary Wilbur Ross[1].

40.      The Gold Medal award is the highest honorary award given by the Department and is granted by the Secretary for distinguished performance characterized by extraordinary, notable, or prestigious contributions, that impact the mission of the Department and/or one or more operating units.[2]

41.     At the end of 2018, Wilcox returned to the U.S. from Germany and was assigned to the BIS Washington Field Office (SAC Nasir Khan).

42.      After returning from the position, Wilcox did not have re-instatement with BIS as a special agent and BIS senior leadership thought highly enough of him to ensure he had a position with the Bureau upon his return.[3]

43.     Because of this transition from diplomatic service to domestic service, Wilcox was moved from Excepted Service (as an ECO) to Career Conditional (as a BIS special agent) and, although he served the government for nearly 23 years, told that he had to serve a one-year probation.

---

[1] https://www.commerce.gov/sites/default/files/202002/Honor%20Awards%20Book%20Sept11_18.pdf

[2] *Steve Wilcox and BIS was recognized for working diligently over the past 3 years (2016, 2017 and 2018) on an investigation that successfully identified serious violations of U.S. export control laws and prosecuted its violators. The defendants were arrested and convicted for illegally exporting micro-electronics to be used in support of foreign government security programs, military operations, and defense space programs in both Russia and Iran. As a result of the investigation, and the group's efforts, the proliferation network was dismantled.*

[3] *When applying for federal agent jobs in OPM, veterans who served after 9/11 received a 10-point veterans' preference. Veterans such as Wilcox, who served prior to 9/11, received 5 points. In the OPM system, it is very difficult to beat out veterans who have 10- point veterans' preference and those who do not, do not typically qualify for a job, even if the applicants are more senior and have more experience. Kevin Kurland, Linda Minsker, John Sonderman, Doug Hassebrock, Nasir Khan, (senior BIS leadership) and others orchestrated a situation around that predicament, so that Wilcox could come back to BIS as a special agent and so that he did not lose Wilcox's retirement as an 1811.*

44.        Shortly after reporting back to the U.S., in early summer of 2019, Wilcox was chosen by Kevin Kurland from a list of people to be the Acting Assistant Director for the BIS Export Control Officer (ECO) Program managing the BIS ECOs (attachés) assigned outside the U.S. at U.S. Embassies throughout the world.

45.        Wilcox was then also asked (by Linda Minsker, the career-appointed Assistant Director of the ECO program) to become the Senior ECO in Beijing, China and a liaison to China's Ministry of Commerce (MOFCOM), after advertising the position in the Office of Personnel Management's (OPM) USAJOBS system.

46.        Wilcox was the desired incumbent because of his competence, professionalism, and reputation for being an outstanding ECO.

47.        Wilcox applied for the position and was immediately selected, and he accepted this position, because of his sense of duty to the country.

48.        Throughout his career, Wilcox successfully maintained a Top Secret / Sensitive Compartmented Security (SCI) Clearance with the SI/TK/GG/HCS caveats.

49.        Until August 2019, his security clearance eligibility was never challenged and was successfully adjudicated by the Department of Defense, Central Intelligence Agency, and Department of Commerce.

50.        As a veteran of the USAF and sworn federal agent, Wilcox always took his Oath of Office seriously and executed the duties of his appointments faithfully.

51.        At the BIS Update Conference in 2019, Wilcox visited the ECOs who were visiting from their overseas positions to attend the conference.

52.        At the Conference, Kevin Kurland, the Deputy Assistant Secretary (DAS) and Acting Assistant Secretary for Export Enforcement, grabbed Wilcox from behind hugging him and said, "*Thank you* [for accepting the Beijing position], *please do not back out*".

53.         Kurland was thanking Wilcox because he (originally reluctantly) agreed to take the position in Beijing. It was clear that BIS maintained a high opinion of Wilcox, as he was well-liked and respected by all U.S. government agencies, internationally by foreign partners, and at all U.S. Embassies in which he worked.

54.         In August 2019, Wilcox's unblemished and stellar career changed due to George Lee and ITMS' baseless, unwarranted, illegal, grossly negligent, and reckless investigation, resulting in the suspension of Wilcox's clearance and his constructive discharge from federal employment.

55.         Defendant ITMS allegedly collaborates and coordinates with the Office of Security (OSY) at the Department of Commerce to enhance protection of the Secretary and the Herbert C. Hoover Building, among other facilities, primarily by identifying and assessing critical threats to the Department's mission, operations, and activities.

56.         ITMS, based in Washington, DC, employs a small team of criminal investigators and according to the Department of Commerce, the ITMS was directed to use the full range of investigative techniques permitted by law or regulation to identify [and] assess unreported or unrecognized threats to the Department's mission, operations or activities, including examining any initiative, project, program, process, function, or incident involving the Department [and] commence or coordinate investigations and operations to protect Departmental personnel, assets, and activities from recognized mission-critical threats.

57.         According to the recent extensive investigation report of the U.S. Senate Committee on Commerce, Science and Transportation, the ITMS lacks the proper legal authority to conduct criminal investigations or engage in counterintelligence activities.

58.         Over the past sixteen years, the ITMS has operated as an investigative police force by relying on delegations of law enforcement authority from other federal agencies. None of those

delegations supply the requisite authorization for ITMS to conduct criminal or counterintelligence investigations.

59.        Defendant Lee, early in ITMS' existence, acknowledged that the unit had "no specific criminal investigative or public law enforcement authority." *Memorandum from George Lee, Office of Sec., Dep't of Commerce, to Rich Yamamoto, Dir. of Sec., Dep't of Commerce, (Apr. 13, 2005), https://www.commerce.senate.gov/services/files/7F85FBCD-446C-4798-AC5A-237DFC79F47.*

60.        Despite this lack of authority, Defendant Lee and other ITMS leaders directed its agents to engage in a troubling variety of criminal and counterintelligence investigations allegedly to protect intangible assets, such as those related to economic intelligence, wire communications, online publications, employee relationships, and **security clearances.**

61.        Defendant Lee admits that the ITMS did not have the proper authority to engage in activities beyond providing protection to the Secretary and federal property.

62.        ITMS conducted "investigations" typically reserved for domestic law enforcement agencies and many, like Plaintiff's, were conducted in an overzealous manner whereby agents abused steps in the investigative process.

63.        Defendant Lee and ITMS used a troubling and illegal variety of tactics to gather intelligence, including ITMS agents regular search of the office space of employees suspected of wrongdoing.

64.        These covert searches involved identity-concealing tactics, and also seized work phones and computers to perform digital content searches, practices that continued until the Department required the unit to cease investigative activities in March 2021.

65.          As in Plaintiff's case, former ITMS agents claim that these activities often happened without any articulable evidence to indicate that the employee maintained suspicious connections with foreign actors or otherwise posed a threat to the Department.

66.          Defendant ITMS is a subordinate component of the DOC pursuant to 28 C.F.R. § 0.1 and, under the direction of its unqualified and inexperienced director, Defendant Lee;

    a.          Has operated as a federal law enforcement and intelligence unit without legal authority;

    b.          For fifteen years, ran criminal probes and counterespionage activities with little oversight;

    c.          Illegally rummaged through the offices and computers of Commerce Department employees;

    d.          Investigated Americans who made disparaging comments about the Census on their social media accounts.

    e.          opened investigations into people who wrote letters to the Secretary of Commerce;

    f.          After its recent five-month investigation, Commerce Department lawyers found that the ITMS lacked "adequate legal authority" to even run the criminal probes it had pursued for 15 years even though this lack of authority did not keep ITMS agents from running names through classified databases.

    g.          Has been recently shut down by the Commerce Department for egregious misconduct, abuse of power, ethnic targeting and reprisal by ITMS staff (including Defendants Lee, Valentine and Bookstaber), and other numerous rights of privacy violations.

67.          Defendant Lee and the leadership of the ITMS were more interested in appearing productive to retain the ability to investigate a wide variety of purported threats with broad discretion––and continue receiving substantial funding from Congress.

68.          Wilcox's high profile and position made him a prime target of scrutiny through the abuse of power exercised by Defendants including ITMS and George Lee.

69.          In August 2019, Wilcox surprisingly received an email from the Office of Security

(OSY), that ITMS/OSY suspended his security clearance with no further details provided.

70.        Wilcox was denied access to the Department of Commerce Headquarters secure workspaces, as well as unescorted access to the BIS Field Office in Herndon, VA.

71.        Defendants ordered the Field Office to change all passcodes for entry to the office, notified all of the agents Wilcox worked with, and requested Wilcox surrender his office key, which caused Wilcox tremendous anxiety and stress.

72.        On approximately September 10, 2019, Wilcox was instructed to report to Commerce Headquarters on September 11, 2019 and was abusively interrogated and asked a series of questions (by Danielle Smith and Star Hilton) questioning his patriotism to the U.S.

73.        Wilcox asked if he was allowed to know why he was being interviewed and why his security clearance was suspended what was happening, and Wilcox was told "*You can discuss with your supervisor*". However, even Wilcox's supervisor had no idea what was going on.

74.        In October of 2019, Wilcox was told that ITMS/OSY was investigating his security clearance, which was actually held at the TS/SCI level by the CIA.

75.        Wilcox, after a committed, unblemished 24-year career, was informally and arbitrarily and baselessly labeled as a "national security threat" by Defendant ITMS.

76.        ITMS/OSY requested Wilcox report to the headquarters building so that Wilcox could "clarify some questions" with Defendants Bookstaber and Valentine of ITMS.

77.        Wilcox reported to Commerce and was escorted to a breakout room by Bookstaber, wherein Defendant Bookstaber immediately asked if he could audio tape the "interrogation" that lasted more than three hours, which interrogation covered the following topics:

- *Reporting of surveillance by the Russian government… Why did Wilcox report so much?*
- *Reporting of foreign contacts*
- *German bank account*
- *Signing a Special Immigrant Visa packed for Natalya Shipitsina Signing a letter of*

*recommendation for Shipitsina*
ï   *The company Wilcox started Global Trade Compliance, LLC If Wilcox accepted any money while employed by BIS*
ï   *If Wilcox had any interests in Chinese companies*
ï   *About emails Wilcox sent himself from his BIS account to his personal account*
ï   *Why does Wilcox have so many email accounts?*
ï   *When was his last polygraph test?*
ï   *Has Wilcox ever been pitched by a foreign government?*
ï   *Has Wilcox ever given sensitive information to a foreign national?*

78.     After the interrogation, Defendant Valentine said, to Wilcox "*They may want you to take a polygraph test.*" Wilcox asked who "they" are? Valentine stated, "*The people who are directing this investigation [ITMS and George Lee]*".

79.     Valentine asked if Wilcox would submit to one. Wilcox said that he would probably want to discuss this with an attorney since this matter, as it is being explained to Wilcox, is an **unclassified matter** being stretched by Defendants to a **classified issue involving his clearance**.

80.     As reported in the recent Office of Inspector General Report, the DOC and Defendants Lee and ITMS failed to maintain a central classification guide to determine the proper clearance levels for documents generated or obtained by agents and allowing Defendants to arbitrarily label categorizations on documents without any formal process in place, which illegally allowed Defendants to categorize documents it wishes to block from public view as "classified."

81.     In many cases, including Plaintiff's, classification labels were allegedly even handwritten instead of digitally imprinted or stamped. These practices contravene the expectations of federal government entities tasked with handling sensitive information.

82.     Defendant Lee and ITMS also allegedly used a classified IT network (CNET) for improper purposes, which CNET contained over 95% unclassified material, including the majority of information obtained by ITMS agents as investigations unfolded.

83.     Defendants structured CNET primarily to store information for the purpose of blocking access to outside entities, which practice purportedly protects the ITMS from Freedom of

Information Act (FOIA) requests and lets the unit conduct operations without fear of mandatory disclosures required by evidentiary rules that proceed through the nation's judicial system.

84.         Under Defendant Lee's management, ITMS was allowed and encouraged to operate outside the norms of the law enforcement and intelligence communities.

85.         Defendants' Lee and ITMS' deficient policies and procedures outlining the unit's investigative capabilities led to repeated instances of malfeasance, including the purposeful prolonging of investigations, unauthorized use of secured messaging systems, and over classification of documents to protect the unit from outside scrutiny.

86.         The Department of Commerce, without exercising any due diligence as to Lee's qualifications and ignoring his inexperience, employed Defendant Lee as a Criminal Investigator under the Office of Personnel Management's Classification System, referred to colloquially as an "1811."

87.         Defendant DOC knowingly employed Defendant Lee who failed to meet the basic training requirements expected of a federal Criminal Investigator and had never completed the requisite training generally required for classification as an 1811.

88.         Defendant Lee and ITMS investigated employees at the Department of Commerce despite minimal, if any, evidence to suggest they presented a threat to the Secretary or "critical assets."

89.         Defendant Lee and ITMS' motivation behind many of these investigations was to investigate highly visible employees to display its investigative capabilities.

90.         In many instances, including Plaintiff's, Defendants Lee and ITMS officials purportedly opened investigations for purposes of intimidation or retribution, creating the allusion that an individual was under investigation when, in fact, no threat existed to Department personnel or property which investigations largely targeted employees within the ITMS and often resulted in their separation from the Department.

91.        The day after Valentine and Bookstaber interrogated Wilcox, they interviewed SAC

Khan and ASAC Johnson regarding Wilcox and his employment with BIS. ITMS required both Kahn

and Johnson to sign Non-Disclosure Agreements(NDAs).

92.        The stress of Defendants' baseless interrogation and investigation caused Wilcox

great emotional distress, which precipitated Khan, during the interrogation process, to ask Wilcox to

go to the Employee Assistance Program (EAP), which Wilcox did.

93.        Wilcox had one session with a counselor, who told Wilcox that EAP cannot help

Wilcox because EAP *"…cannot be made to testify in any case against Commerce…"*, but she opined

that Wilcox needed to talk with someone. (Wilcox never mentioned to her anything about pursuing a

case against Commerce).

94.        The counselor gave Wilcox a list of people to talk to in the DC area, but everyone on

the list was either retired or would not see Wilcox as an EAP referral. Wilcox apprised SAC Khan of

this. SAC Khan arranged for Wilcox to receive counseling assistance through someone affiliated with

the Fairfax County Sheriff's Office.

95.        At one point in November 2019, Wilcox was asked to have coffee by Kevin Kurland,

who, at the meeting, looked visibly upset and who proceeded to inquire if Wilcox had a back-up plan,

stating something was "*coming down*" regarding Wilcox from Lee, OSY and OGC.

96.        Wilcox asked, *"What could possibly be coming down…I didn't do anything, unless

ITMS is trying to get rid of me while I am on 'probation'"*. To which Kurland responded that was

exactly the case.

97.        On or about November 30, 2019, Wilcox was informed by  John Sonderman, the

Director of the Office of Export Enforcement, BIS ("Sonderman"), that Wilcox needed to send an

email to John Geunther, the Office of General Counsel (OGC) stating that "*Wilcox is requesting an*

*extension of his probationary period until the end of the OSY inquiry into his security clearance*", which Wilcox did, verbatim, which Sonderman instructed Wilcox to exactly write.

98.    Senior ITMS officials, including Defendants Lee and Valentine, sought to entrap subordinates viewed as disobedient and disloyal in administrative inquiries, often issuing *probationary periods to employees* who, like Plaintiff, challenged the lawfulness of the unit's practices.

99.    On December 5, 2019, Wilcox was summoned to SAC Khan's office at the BIS Washington Field Office and was presented with a Resolution Agreement by SAC Khan and ASAC Johnson.

100.    John Sonderman was present via telephone and told Wilcox that he needed to sign the Resolution Agreement by the next morning, Friday at 0900, or Sonderman would fire him.

101.    According to the Senate Commerce Committee report, ITMS officials searched computers, cell phones, and office space of employees who had separated from the unit, retroactively altering the classification of documents allowing the Department to initiate post-employment proceedings with penalties that included ***revocation of security clearances***.

102.    Wilcox was blindsided and shaken when he was presented with the Resolution Agreement and told by Sonderman to sign or be immediately terminated if Wilcox did not sign the Resolution Agreement THE NEXT MORNING before 9:00 a.m.!!!

103.    Wilcox was not able to find an attorney available to review the Agreement and advise him regarding the governments' threat of termination between Thursday evening and 9:00 am the next morning!

104.    The agreement contained unreasonable, unfair and legalese terms (including waivers of his rights to appeal), not understood by Wilcox.

105.    This is not what Wilcox was told would happen and expected by Sonderman,

who initially told Wilcox that Wilcox was to request for an extension of his probationary period until the end of the OSY inquiry.

106.     Under great stress and coercion, which Wilcox communicated to SAC Khan and ASAC Johnson, on Friday morning on December 6, 2019, Wilcox signed the Resolution Agreement *under duress* and without the opportunity to consult or retain an attorney. He did this because of the above referenced and perceived and continued threats and the fear of retaliation and losing his career, livelihood, and medical insurance, etc., and ability to provide for his daughter.

107.     After a 24-year distinguished career, recent acceptance of promotion to serve as Senior ECO of Beijing, China, and stellar performance evaluations, Wilcox, a 2018 Gold Medal recipient, was coerced and forced to sign a Resolution Agreement the next morning, (See, attached as *Exhibit 2*) and resign his federal employment under duress with no explanation or stated or written reason, or the opportunity to seek legal representation, or face immediate termination.

108.     Defendants, including ITMS and Lee, used Wilcox's probation against him to get what Lee wanted, which was an apparent high-profile statistic, without accusing Wilcox of anything substantive, officially – even to date.

109.     Wilcox was denied procedural due process when he was coerced and pressured to "resign".

110.     The coerced Resolution Agreement forced Wilcox to waive his rights to an appeal which is one of the reasons, aside from fear of further retaliation, that Wilcox was afraid of filing, and did not think he had a right to file, any appeal with the U.S. Merit Systems Protection Board ("MSPB").

111.     Wilcox reluctantly and under duress resigned for fear of continued (baseless) threats and reprisals and retaliation from the U.S. government and Defendants.

112.         In June 2020, one of the ITMS, OSY special agents, Chris Cheung, who was the third Case Agent on ITMS' bogus and baseless investigation, contacted Wilcox and apologized to Wilcox for what he was put through by Lee and explained to Wilcox what OSY was doing to Wilcox in detail, admitting that Lee and OSY had nothing on Wilcox and used his probation against Wilcox to have Wilcox "*terminated as a statistic…*".

113.         Wilcox, post-termination, was informed that the investigation on Wilcox was initiated by ITMS/OSY in or about 2017 and was also told that, in 2016, his security clearance update investigation was being conducted by the Office of Personnel Management ("OPM") investigator in Frankfurt, Germany.

114.         In 2016, the background investigator asked Wilcox about an issue involving his ex-wife in Italy and a management directed inquiry NCIS conducted into his short relationship with a Ukrainian national. Wilcox spoke to the NCIS investigator truthfully about what happened, and that he asked for permission to conduct the relationship in advance, as well as reported the Ukrainian national as a foreign contact, and said the internal inquiry was quickly closed. Wilcox was never reprimanded, as there was no merit to it, and his clearance was adjudicated since with no issues[4].

---

[4]*During his time in Italy, Wilcox, and his wife (a special agent with NCIS) were pursuing a divorce and were legally separated. While in Ukraine in 2011 supporting a joint U.S., NATO and Black Sea country naval exercise, he was protecting 5000 USN and USMC soldiers and sailors. Towards the end of the exercise, Wilcox asked the Force Protection Detachment special agent, the Defense Attaché, and the Regional Security Officer assigned to the U.S. Embassy in Kyiv, if he may go on a date with a Ukrainian Female. Wilcox also requested permission to do this from his Supervisory special agent. There were no objections, and he was instructed to report the Foreign Contact. Wilcox reported the contact to the Special Security Officer and all aforementioned parties. Wilcox ended the short 3-week relationship.*
*In 2012, upon returning to the U.S. Wilcox was called into the Assistant special agent in Charge (ASACs) office in Washington, DC, Jawad Mashny (friend of his ex-wife who was the ASAC in Italy with us), who told Wilcox that he was opening a Management Directed Inquiry on Wilcox and his contact with a Ukrainian National. As Wilcox was informed by another colleague, his ex-wife and her friend, also a NCIS special agent, reported that Wilcox was dating a FSB Agent in Ukraine and that "Wilcox was a threat to U.S. National Security". This was retaliation from his ex-wife and was blatantly false. Wilcox recalled this NCIS agent, on a trip to Russia with Wilcox, asking Wilcox how Wilcox knew the girl in Ukraine was not a FSB Agent, and Wilcox said no more or less than the RSO in Kyiv and the Defense Attaché know as to whether or not their Russian-speaking wives are, or are not, foreign intelligence officers. ASAC Mashny attempted to get the NCIS IG to accept the case, but the inquiry was declined by the Inspector General and the case was closed because of how the case was initiated and that it **_had no merit._** Wilcox was simply reminded to ensure Wilcox report contact with foreign nationals. Wilcox' security clearance was adjudicated twice since that time successfully and without issue.*

115.         OPM notified OSY that this matter occurred, and OSY FOIAed the reports from NCIS.

116.         According to the former ITMS/OSY investigator, Chris Cheung, OSY extensively investigated Wilcox which revealed no derogatory information about Wilcox and Cheung told Defendant George Lee that the case needed to be closed because Wilcox did nothing wrong. ITMS could not find anything wrong with Wilcox in their interviews.

117.         Defendant Lee, who refused to allow agents to close cases, including Plaintiff's, responded, "***Keep looking, you just haven't found it.***"

118.         Defendant DOC, when it hired Defendant Lee, knew or should have known that Defendant Lee lacked the proper qualifications to lead ITMS and lacked the proper qualifications to lead a criminal investigative, counterintelligence or counterespionage program.

119.         The Defendants Lee and ITMS instituted and provided an unaccredited Basic Agent Training (BAT), which endangered the safety of participating agents and the general public.

120.         Defendants Lee and ITMS targeted employees for investigation within ITMS for challenging the unit's legal authorities, demonstrating an egregious pattern of reprisal.

121.         The DOC's rogue unit, ITMS, through its unqualified director, Lee, opened investigations into a variety of employees without reasonable suspicion for the purpose of exaggerating the unit's ability to uncover security threats within the civil service.

122.         Defendant Lee opened cases on a variety of DOC employees, including Plaintiff, for the purpose of exaggerating the unit's ability to uncover security risks within the civil service.

123.         Defendant DOC was aware of and had been on notice of Defendants Lee and ITMS' chronic mismanagement and allowed ITMS and Lee to continue to operate with a high degree of secrecy.

124.         Before ITMS' and Lee's baseless and illegal investigation and before Wilcox was

constructively terminated, Wilcox's security clearance was positively adjudicated with the CIA, until, post this bogus investigation, it was suspended by OSY (*Not by the CIA*).

125.        Wilcox's employment with Defendant Department of Commerce has ended, but the extent of damage suffered by Plaintiff and caused by Defendants continues to grow.

126.        Neither Defendant Lee nor ITMS ever explained its reasoning for restricting Wilcox's clearance or his constructive discharge causing Wilcox extreme emotional distress and embarrassment.

127.        In Administrative investigations, ITMS was required to read people their Garrity rights, which had to be done by providing something written to an interviewee according to OGC and the Commerce Department's policy, in accordance with the Inspector General's Office's policy.

128.        Wilcox was not presented with anything written and did not signing anything.

129.        OSY agent Cheung stated that the written Garrity warning, which was never given to Wilcox, needed to be approved by OGC, which process George Lee never did while Cheung was there.

130.        Since the interrogation on Wilcox was audio taped, Defendants have also intentionally or negligently failed to preserve and produce the audio tape which tape contains the Fifth and Fourteenth Amendments' Garrity Warning, which reads, in pertinent part:

*"You are being asked to provide information as part of an internal and/or administrative investigation. This is a voluntary interview and you do not have to answer questions if your answers would tend to implicate you in a crime. No disciplinary action will be taken against you solely for refusing to answer questions. However, the evidentiary value of your silence may be considered in administrative proceedings as part of the facts surrounding your case. Any statement you do choose to provide may be used as evidence in criminal and/or administrative proceedings..."*

131.        As a result of the unwarranted scrutiny and bogus investigations as delineated above, and after receiving information from government inside reliable sources, Wilcox submitted FOIA requests to the Department of Commerce, and the Department of Navy for all investigative reports and files related to inquiries on Wilcox.

132.     The Navy appropriately responded within the FOIA time frame that it **had no file.**

133.     To date, **no response or information was received** from any entity **including Defendant DOC.**

134.     Wilcox constructively exhausted his administrative remedies under 5 U.S.C. SECTION 552(a)(6)(C) which provides in pertinent part as follows:

*Any person making a request to any agency for records under paragraphs (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph…".*

135.     Wilcox was also "unofficially" recently informed that his file is "missing"!!!!!!

136.     To date, neither Lee or ITMS or any person or entity ever told Wilcox what he did wrong.

137.     ITMS suspended Wilcox's Top-Secret SCI/SI/TK/GG/HCS security clearance, which he had since 1997, seemingly because of *unclassified matters*.

138.     ITMS summoned Wilcox to DOC HQ and questioned his loyalty to the U.S. and integrity on the anniversary of 9/11…which also additionally caused Wilcox great debilitating distress.

139.     Defendant ITMS agents, George Lee, Tom Valentine, and Jason Bookstaber, not only took Wilcox's job, ITMS took Wilcox's "life purpose."

140.     Defendants Lee, Valentine and Bookstaber violated Wilcox's rights for professional advancement and to promote and validate ITMS' illegal, rogue, abusive and discriminatory practices.

https://www.commerce.senate.gov/2021/9/wicker-statement-on-commerce-department-s-report-confirming-misconduct-at-itms

141.     Despite being told by other case agents on Wilcox's investigation that Wilcox did nothing wrong and that there was no information suggesting Wilcox was a threat to the U.S., all Defendants, Lee and ITMS relentlessly pursued a case against Wilcox despite the lack of any evidence.

142.         ITMS never, to date, informed Wilcox what Wilcox did, but instead orchestrated an illegal constructive discharge without the right of appeal - forcing Wilcox out of his career with the government and is, *inter alia*, the proximate cause of Wilcox' emotional distress.

143.         An employee currently assigned to ITMS opined that Wilcox's case file was given to Deputy Assistant Secretary for Intelligence and Security (DODIS) John Costello in November/December 2020 for review and now reports that Wilcox's case file is missing.

144.         ITMS personnel were asked to review Wilcox's case file and provide their findings to the Office of General Counsel (OGC) but were unable to find the file.

145.         The Senate Investigations Committee requested a copy of Plaintiff's case file and it was not provided by Commerce.

146.         Senator Wicker's May 17, 2021 letter to the Inspector General US Department of Commerce reads, in pertinent part, as follows:

> "*My ongoing investigation into misconduct at the ITMS has revealed that your Office reviewed similar claims as early as 2017. It seems the reviews by your office lacked the veracity to identify the unlawful conduct that has plagued the Department for more than a decade. This information suggests a continuation of past poor performance, which is a grave disservice not only to Department employees but also the taxpaying American public…" (See* **Exhibit 4***, attached).*

147.         Wilcox submitted a FOIA request for a copy of his case file and the FOIA request was not even acknowledged by any entity including the DOC.

148.         This caused great Wilcox distress and for the first time in his career, distrust of the Federal government, to which he dedicated his life.

149.         Plaintiff alleges that Defendants, and/or someone who worked for ITMS and Lee on Wilcox's investigation, intentionally destroyed Wilcox's case file.

150.         The Defendants' actions were illegal and, understanding that his administrative remedies were "waived' by signing the Resolution Agreement and not available to him and also were exhausted since his FOIA requests were repeatedly ignored by the DOC and understandably losing

confidence in the system which he protected with his life, Wilcox was concerned about further retaliatory actions by the Defendants and the government if he filed an appeal to the Merit System Protection Board (MSPB), which right of appeal he was understood he was coerced to waive.

151.     George Lee, even though he reported to Costello, opened an investigation on his supervisor (Costello) and was monitoring Costello's emails.

152.     ITMS employees and agents are now on paid administrative leave pending a Reduction in Force (RIF) or reassignment to other Bureaus within Commerce, since the entire ITMS section was disbanded.

153.     The OGC is issuing letters to close cases which were left opened to avoid answering FOIA requests, and to then destroy existing case files.

154.     On September 3, 2021, the U.S. Department of Commerce published its findings of the internal review of the Investigations and Threat Management Service (ITMS) and recommended immediate actions to address outstanding issues, which recommendation reads, in pertinent part, as follows:

> "...The report from the Office of Inspector General (OIG) addressing allegations of misconduct concerning ITMS spanning several years. After receiving the OIG report, the Department suspended all investigative activity and initiated a review to assess the overall practices, policies, and performance of ITMS in fulfilling its missions and recommend a future path for ITMS. "Our most important priority is creating an environment at the Department of Commerce where employees feel safe and respected," said Secretary Raimondo. "We are committed to maintaining our security, but also equally committed to protecting the privacy and civil liberties of our employees and the public. This report and the actions we are taking underscore our commitment that the Department operate with respect for the rule of law, the rights of employees and the American people...The Commerce Department leadership team took the ITMS allegations very seriously and upon learning about the concerns, immediately suspended all criminal enforcement activity and initiated a 90-day review to determine a comprehensive solution that would address these issues," said Deputy Secretary Graves. "Commerce leadership has reviewed and accepted the recommendations in the report and will begin implementation immediately...and to ensure that no information developed by ITMS records inform future decisions without a prior legal review and independent factual corroboration."

155.     The lack of any oversight by Defendant DOC has allowed ITMS to conduct illegal investigations without following best practices in line with proper law enforcement norms and expectations, including informing witnesses and subjects of their rights, or properly documenting investigative efforts, such as memorializing interviews or retaining notes in electronic case files.

156.        Few internal procedures existed with ITMS to provide guidance on case management, which reportedly led to an abuse of the document classification process that shielded investigations from external review by other branches of government, including Congress.

157.        Wilcox cannot work for any government agency again because of what Defendants did in suspending his clearance without ANY reason and without due process.

158.        Wilcox's options to work as any government contractor either in a position requiring any security clearance, is significantly limited as to what jobs Wilcox could take.

159.        A massive part of his professional marketability is Wilcox's extensive and unblemished government experience, but without a clearance or record of a suspended clearance, Wilcox's marketability in the private sector has been severely diminished by Defendant Lee and the Department of Commerce, which is the cause of Wilcox's emotional distress and economic loss.

160.        Wilcox lost close friends, his reputation and status within the federal law enforcement and intelligence communities[5].

161.        Lee and ITMS and the Commerce Department's actions embarrassed Wilcox to his close colleagues at BIS, the FBI, CIA and Wilcox's family and daughter and essentially took Wilcox's life away and everything for which Wilcox worked.

162.        Today, Wilcox cannot even hear the national anthem without distress and an emotional response, not because of his heart-felt life-long patriotism, service to and love of this country and his conviction and pride he had as a public servant, but because the Defendants, including

---

[5] *Wilcox was denied access to secure workspaces at HQ and the Washington Field Office, resulting in the passcodes needing to be changes and all personnel said that ITMS could not discuss anything with Wilcox. Wilcox was embarrassed and ashamed in front of Wilcox's peers, supervisors who trusted Wilcox and fought to ensure Wilcox had a position after returning to the U.S., as well as Wilcox's close contacts at the CIA and FBI. Wilcox's reputation was damaged with the FBI, CIA and colleagues within BIS, rumors spread Wilcox was a counterintelligence threat against the U.S. Wilcox clearly was not. Wilcox's reputation was also damaged when Wilcox disappeared with the Foreign Commercial Service, who Wilcox was working with in preparation to report to China.*

the DOC and BIS, allowed George Lee and this government to recklessly, intentionally and unfairly end Wilcox's career without cause.

163.      These incidents as delineated above, caused Wilcox such deep anxiety and depression that he needed to move away from DC to Wilcox's hometown so he could be around family for emotional support.

164.      Wilcox is undergoing counseling to deal with the compounding stress proximately caused by ITMS, DOC and Lee's unwarranted and unsubstantiated constructive termination of Wilcox's life-long avocation and career.

165.      Wilcox lost retirement and other benefits and has and continues to suffer damages.

166.      As a direct and proximate result of Lee's, the DOC's and ITMS's actions and failure to act, Wilcox has also been deprived of:

- *The Senior Diplomat position of Senior ECO Position in Beijing (FS-1) (Wilcox was offered and he accepted and which agreement the DOC breached),*
- *Drawing his pension at 50 years of age*
- *The money for drawing his pension between 50 and 62*
- *Additional 6 years' worth of accrual in his pension between 44 years of age and 50 (retirement)*
- *Retiring as a "Federal Agent", with retirement badge and credentials*
- *The value of his pension with 6 more years of time added post 62 years of age*
- *The medical benefits afforded U.S. government employees after retirement.*

167.      Defendants responded to Plaintiff's two decades of unblemished and non-partisan public service with a politically motivated and retaliatory constructive firing in December 2019 when Defendants forced Wilcox to sign an agreement waiving his rights under extreme duress.

168.      Defendants' actions intentionally, recklessly and negligently have harmed Plaintiff's reputation, professional standing and vitiated his retirement benefits.

169.      Plaintiff asks this court to find that his termination was unlawful, the Resolution Agreement void, and to award him any and all remedies necessary to enable him to receive his fully earned potential income, pension, healthcare insurance, and other retirement benefits.

170.        Defendants never applied the procedures and policies regularly applicable to government employees in Plaintiff's circumstances, which would have let Plaintiff retire with the full benefits he had earned over two plus decades of loyal and honorable service to the United States.

171.        Plaintiff seeks to vindicate his rights and address the chilling effect of Defendants' message to career civil servants, like Plaintiff, who are at risk for self-promoting and politically motivated termination.

172.        Plaintiff hereby asks the Court to review Defendants' decisions to terminate Plaintiff on the grounds that ITMS violated the Fourth Amendment, because those decisions were unlawful.

173.        Plaintiff also asks the Court to review Defendants' termination decision on the grounds that it violated the Fifth Amendment's Due Process Clause, because Wilcox was forced to sign under duress, and it was undertaken without lawful authority and in violation of explicit procedural protections.

174.        Plaintiff seeks equitable relief in vindication of his constitutional rights; declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201- 2202; and mandamus relief under 28 U.S.C. § 1361.

175.        Plaintiff requests that the Court exercise its jurisdiction and authority to issue a Declaratory Judgment that the Resolution Agreement is void, Defendants' termination was a legal nullity, that Plaintiff's security clearances are in good standing, and that Plaintiff is immediately entitled to his full benefits and pension and all other benefits, privileges, and rights currently being withheld.

176.        In the alternative, Plaintiff requests that the Court exercise its jurisdiction and authority to issue a declaratory judgment that Defendants' termination of Plaintiff's employment was unlawful, and to order equitable relief that reverses Defendants' unlawful personnel actions, and enjoin Defendants from interfering with Plaintiff's receipt of his benefits.

177.        Plaintiff also requests that the Court provide all other relief, including writs of mandamus, that the Court deems appropriate.

## COUNT I

### FIRST CAUSE OF ACTION: FEDERAL TORT CLAIMS ACT - 28 U.S.C. § 1346(B)
### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

178.        Plaintiff re-alleges and incorporates by reference all paragraphs herein and above.

179.        Under Pennsylvania law, the tort of intentional infliction of emotional distress has four elements: (1) the defendant must act intentionally or recklessly; (2) the defendant's conduct must be extreme and outrageous; and (3) the conduct must be the cause (4) of severe emotional distress. 180. The Defendants and its agents acted within the scope of their office or employment under circumstances where the United States, if it were a private person, would be liable to Plaintiff in accordance with the laws of the Commonwealth of Pennsylvania.

181.        The Defendants knowingly, intentionally, and/or recklessly caused Wilcox severe emotional distress as more fully addressed and described above and herein.

182.        The Defendants extreme and outrageous conduct and actions were in furtherance of Defendant Lee and the ITMS' illegal policies sanctioned by the DOC.

183.        Defendants, agents of the Federal government, the Nation's largest employer, breached its duty of care to its employee, Wilcox, and violated the Federal merit system principles that "…[a]ll employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management" (5 U.S.C. 2301(b)(1), (2)), which breach caused Plaintiff harm.

184.        Defendants' and its agents' negligent, intentional and reckless conduct caused Wilcox to suffer extreme emotional distress that continues to date.

185.        Plaintiff's severe emotional distress was caused by DOC agents' and Defendants' actions which were severe and contributed to Wilcox's need for continued medical treatment.

## COUNT II

**PLAINTIFF'S CONSTRUCTIVE TERMINATION WAS A LEGAL NULLITY OR, ALTERNATIVELY, WAS *ULTRA VIRES* AGENCY ACTION IN VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE.**

186.        The Paragraphs above are incorporated and reasserted as if fully set forth herein.

187.        ITMS' termination of Plaintiff was not a valid termination action.

Alternatively, Plaintiff's termination, as set forth above, was an *ultra vires* agency action that violated the Fifth Amendment's Due Process Clause.

188.        To constructively remove Plaintiff from the career civil service, Defendants were required to specify in writing the reasons for its decision, state an effective date for removal, and deliver this information to Plaintiff on or before the effective date of the action so that he may address and exhaust his administrative rights.

189.        Not only did this not occur but Defendants intentionally, negligently, and recklessly destroyed Plaintiff's investigation file and all records.

190.        Defendants' actions caused Plaintiff serious emotional distress and have harmed Plaintiff by denying him due process, damaging his reputation, depriving him of his rightful status as a government employee in good standing, eliminating his primary source of income, and reducing his retirement benefits by depriving him of his full vested pension and related benefits and caused and still causes him great embarrassment.

## COUNT III

**PLAINTIFF WAS TERMINATED THROUGH SHAM AND ACCELERATED PROCEEDINGS THAT IGNORED STATUTORY PROCEDURES AND AGENCY POLICIES, IN VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE.**

191.        The Paragraphs herein are incorporated and reasserted as if fully set forth herein.

192.        Defendants further violated the Fifth Amendment by ignoring applicable statutory and

agency processes in order to accelerate Plaintiff's termination, thereby depriving him of his property interest in his employment and full vested pension and related benefits, including health insurance, without due process of law and causing Wilcox severe emotional distress.

193.        Plaintiff was entitled to a meaningful opportunity to evaluate and respond to the allegations against him before being terminated and to properly and intelligently exhaust any administrative remedies, including any appeals, to which Wilcox was informed, he waived.

194.        Defendants deprived Plaintiff of that meaningful opportunity when implementing Defendants' and Lee's directive to destroy Wilcox's file which caused Plaintiff to suffer severe emotional distress with the loss of his career, employment and full benefits.

195.        Defendants knew that this intentional, baseless, unlawful and malicious, directive would require circumventing the law and procedures and would cause Wilcox severe emotional distress.

196.        By statute, Plaintiff was entitled to reasonable notice and an explanation or reason and an opportunity to exercise his rights before his termination could become final.

197.        Plaintiff received less than fifteen (15) hours overnight to have the coerced Resolution Agreement reviewed by an attorney with no explanation (even to date) as to what basis upon which ITMS relied and for ANY reason his removal was based and to prepare for a hearing or written objection or defense or appeal, which rights Wilcox was informed and believed he waived based upon the language of the coerced Resolution Agreement.

198.        Plaintiff therefore did not receive a meaningful opportunity to respond to the constructive termination in violation of the Due Process Clause.

199.        Additionally, Plaintiff's separation from the agency was not due to "gross misconduct" or ANY misconduct.

200.        Plaintiff therefore never had a neutral, informed, and independent decision-maker

address his case. In truth and in fact, the sole decision-makers concerning Plaintiff's termination were Defendants, including Lee and ITMS.

201.        Defendants' deficient termination proceedings also deprived Plaintiff of his right to appeal and constitutionally protected liberty interest in his reputation, in violation of the Fifth Amendment.

202.        As a result, Plaintiff's unblemished reputation has been stigmatized with false charges, and his prospects for future employment with the government have been foreclosed, and his prospects for other future public and private employment in law enforcement and related professions have been greatly hampered, causing Wilcox severe injuries and emotional distress.

203.        Any provision of agency regulation or policy that might purport to authorize the procedure followed in connection with Plaintiff's termination would be unlawful.

204.        Any statute that may purport to authorize the procedure followed in connection with Plaintiff's termination would be unconstitutional.

205.        Defendants' unlawful action harmed Plaintiff by causing him severe emotional distress, embarrassment and shame and by denying him due process, damaging his reputation, depriving him of his rightful status as a government employee in good standing, eliminating his primary source of income, and reducing his retirement benefits by depriving him of his full pension and related benefits.

## COUNT IV

### *Mandamus*

206.        The Paragraphs herein and above are incorporated and reasserted as if fully set forth herein.

207.        The provisions of 28 U.S.C. § 1361 provide a statutory basis for jurisdiction in cases seeking relief in the nature of *mandamus* against federal officers, employees, and agencies, and they

provide for an independent cause of action in the absence of any other available remedies.

208.     Defendants' actions, as set forth above, constitute an unlawful refusal of the DOC to recognize that Defendants' actions constituted unlawful personnel actions.

209.     Plaintiff has a clear right to be recognized as an agent in good standing, or, in the alternative, to be so that he may receive his vested benefits.

210.     Defendants have a clear non-discretionary duty to Wilcox rescind Plaintiff's unlawful termination.

211.     Plaintiff is entitled to relief in *mandamus* compelling Defendants to rescind the Resolution Agreement and unlawful constructive termination.

## COUNT V

### INTENTIONAL SPOLIATION OF EVIDENCE AND PLAINTIFF'S INVESTIGATION RECORDS and FOIA VIOLATIONS

212.     The Paragraphs above are incorporated and reasserted as if fully set forth herein.

213.     Defendants had complete control and the responsibility to preserve and keep safe the investigation file that contained all "evidence" to support Defendants' basis to constructively terminate Plaintiff.

214.     Defendants' actions support Plaintiff's claim for spoliation of evidence since:

   ї  Defendants have suppressed and have withheld or have destroyed all evidence and Plaintiff's file.
   ї  The evidence was relevant to this case and was intentionally withheld ***even after Plaintiff filed a FOIA request***, to which the DOC never responded.
   ї  It is reasonably foreseeable that this file and the evidence would be discoverable.
   ї  Defendants' actual suppression and withholding of this evidence was intentional and was in bad faith. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3rd Cir. 1994)

215.     Plaintiff is entitled to sanctions, including punitive damages, against Defendants since the spoliation was beyond accident or mere negligence and was intentional.

216.     The Defendant spoliators acted in "bad faith" therefore all adverse inferences   will be provided to Plaintiff.

## COUNT VI

### VIOLATION OF FOIA

**DEFENDANTS INTENTIONAL FAILURE TO RESPOND TO PLAINTIFF'S FOIA REQUESTS CONSTITUTES PLAINTIFF'S CONSTRUCTIVE EXHAUSTION OF ADMINISTRATIVE REMEDIES**

217.        The Paragraphs above are incorporated and reasserted as if fully set forth herein.

218.        Plaintiff made a proper FOIA request in accordance with agency regulations. (See, *Exhibit 4,* attached)

219.        Defendants never responded to Plaintiff and never notified Plaintiff of any unusual circumstances or clarification of the requests from Defendants.

220.        Plaintiff never received any response or final determination, including, Defendants' failure to:

ï gather and review the documents;

ï determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and

ï inform the Wilcox as the requester that he can appeal whatever portion of the 'determination' is adverse.

221.        Plaintiff is deemed to have exhausted his administrative remedies with respect to his request since the Defendants failed to comply with the applicable time limit provisions set forth in FOIA for responding to Plaintiff's request.

222.        To require Plaintiff who has been denied the production of Plaintiff's file to exhaust administrative remedies before seeking judicial review would defeat FOIA'S aim to insure the full or partial disclosure of previously unreleased information and documents controlled by the United States government upon request.

223.         Plaintiff is entitled receive the information which allegedly was the basis of which Defendants allegedly made their decisions.

224.        Defendants breached its duty to Plaintiff in intentionally failing to respond to the FOIA request.

225.     Defendants breached several privacy enacted statutes including but not limited to the Freedom of Information Act and OPEN Government Act of 2007.

226.     The remedies available to Plaintiff under the FOIA include:

ï  an order for injunction;

ï  writ of mandamus or a civil action in the nature of mandamus;

ï  an order for damages, including punitive damages; and

ï  an order for production of agency records.

227.     Plaintiff is entitled to a writ of mandamus, since Plaintiff has satisfied the following:

ï          there is no statutory exception or common-law limitation offered by Defendants;

ï          that there is no specifically stated contrary reason submitted by Defendants, the guardian of the public record;

ï          that there is a legal duty on the part of the Defendants to perform a non-discretionary act;

ï          that there is a demand for performance of such act; and

ï          that there is a refusal to perform an act demanded.

228.     Plaintiff is entitled to punitive damages and reasonable attorney's fees since Defendants' arbitrary delay and unlawful, intentional and willful refusal to issue or disclose copies of public record caused substantial harm and severe emotional distress to Plaintiff.

## COUNT VII

### NEGLIGENT HIRING, RETENTION, SUPERVISION

229.     The Paragraphs above and herein are incorporated and reasserted herein.

230.     Defendant DOC has failed to exercise reasonable care in the selection, training, retention and supervision of its employees, including Defendant Lee.

231.       The Defendants

    a.  owed a duty of care to Wilcox, an employee of the DOC,

    b.  failed to perform the duty of care,

    c.  failure was the proximate cause of the Wilcox's damages, and

    d.  Intentionally or recklessly caused Wilcox to sustain actual loss and injury, including severe emotional distress.

232.       Defendant DOC breached its duty to protect Plaintiff and other DOC employees against a risk of harm, which was foreseeable.

233.       All Defendants', including Defendant DOC, conduct was wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others, including Plaintiff. Defendant DOC knew or should have known that Defendant Lee was unqualified for his position with ITMS.

234.       Defendants had direct knowledge of and realized and appreciated the risk, and it acted in conscious disregard or indifference to it since it employed and retained Defendants Lee, Bookstabber and Valentine even though it was aware of all of the problems, lack of training and experience and inappropriate conduct of Defendants including specifically Defendant Lee and ITMS for years before the wrongful and baseless, career ending termination of Plaintiff's employment which caused Wilcox serve emotional distress and economic loss.

## COUNT VIII

### BREACH OF CONTRACT

235.       The Paragraphs above and herein are incorporated and reasserted as if fully set forth herein.

236.       In early summer of 2019, Wilcox was chosen by Kevin Kurland from a list of people to be the Acting Assistant Director for the BIS Export Control Officer (ECO) Program managing the BIS ECOs (attachés) assigned outside the U.S. at U.S. Embassies throughout the world.

237.       Wilcox was then also asked (by Linda Minsker, the career-appointed Assistant

Director of the ECO program) to become the Senior ECO in Beijing, China and a liaison to China's Ministry of Commerce (MOFCOM), after advertising the position in the Office of Personnel Management's (OPM) USAJOBS system, and not selecting an incumbent twice. (*All agreements and evidence regarding the Minsker's offer and Willcox's acceptance are in the possession of the Assistant Director of the ECO program, to which Wilcox has no access. (See, **Exhibit 5).***

238.       As Wilcox understood, he was the desired incumbent because of his competence, professionalism, and reputation for being an outstanding ECO.

239.       Wilcox applied for the position and was immediately selected.

240.       Wilcox accepted this position, because of his sense of duty to the country.

241.       Wilcox has been damaged professionally, economically and has suffered great emotional stress caused by the breach of contract by Defendant Department of Commerce.

## COUNT IX

### TORTIOUS INTERFERENCE WITH CONTRACT

242.       The Paragraphs above are incorporated and reasserted as if fully set forth herein.

243.       Defendants intentionally interfered with Wilcox's Beijing agreement above delineated.

244.       Defendants knew that Wilcox accepted the position in Beijing.

245.       Defendants tortiously interfered with Wilcox's contract claim since: (1) there was a valid and enforceable existing contract as delineated herein; (2) Defendants were aware of the contractual relationship; (3) Defendants acted intentionally and were unjustified in causing the breach of the contract; (4) a subsequent breach by the other caused by Defendants Lee and ITMS wrongful conduct; and (5) Wilcox's damages, including economic damages described herein and severe emotional distress.

246.        The two-year Statute of Limitations for all of Wilcox's claims herein, including Tortious Interference with a Contract, under the FTCA, 28 U.S.C. § 2401, is tolled as Wilcox filed his administrative complaint under the same facts and circumstances herein within the two-year Statute of Limitations (December 6, 2021) and these claims are now being filed in this court within six months of the date of the mailing of the denial of Wilcox's administrative claim (***Exhibit 2***, attached).

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court:

a. **<u>Rescind Resolution Agreement</u>***:* Rescind the entire coerced Resolution Agreement executed by Wilcox under duress.

b. **<u>Security Clearance Reinstated:</u>** Reinstate Wilcox's security clearance and purge records of suspension and/or revocation.

c. **<u>Career Appointment: "Competitive Service"</u>** All documentation in the DOC/OPM systems will reflect that Wilcox is classified as being able to serve in ***Competitive Service***, not Career Conditional (the temporary status) as it does now.

d. Order the Department of Commerce to conduct a review of all adverse employment actions directed or informed by ITMS, which review should include, retirements, resignations, and terminations with significant scrutiny placed on related Non-Disclosure, Resolution, Settlement, and other agreements negotiated by ITMS officials, including Defendant Lee.

e. Declare that Plaintiff's termination was a legal nullity or, in the alternative, that Defendants violated Plaintiff's constitutional rights by demoting him and terminating his employment;

f.  Expunge Plaintiff's personnel file of all records related to Defendants'
    unconstitutional termination decisions;

g.  Order Defendants to process and pay Plaintiff's benefits including full
    pension, salary, and provide all other related benefits;

h.  Enjoin Defendants from further retaliation and other violations of Plaintiff's
    rights;

i.  Issue writs of *mandamus* as appropriate;

j.  Award Plaintiff compensatory and punitive damages and his costs, interest,
    and reasonable attorneys' fees incurred in this action; and

k.  Award other relief as the Court deems just.


DATED: February 27, 2022                     Respectfully submitted,

                                             *John Robertson*
                                             _____
                                             JOHN T. ROBERTSON, ESQUIRE
                                             ATTORNEY ID: 53732

                                             ATTORNEY FOR PLAINTIFF
                                             1845 WALNUT STREET, 21ST FLOOR
                                             PHILADELPHIA PA 19103
                                             215-567-8300 Ext 265
                                             jrobertson@feldmanshepherd.com
                                             jr@jtrlaw.com

# VERIFICATION
# OF
# COMPLAINT

Stephen Wilcox, Plaintiff, states that he has read the foregoing Complaint and believe the allegations and contents thereof to be true and correct to the best of his information, knowledge and belief.

These statements are made pursuant to the penalties of 18 Pa. C. S. §4904 relating to unsworn falsifications to authorities.

DATED: February 24, 2022

Stephen Wilcox

**EXHIBIT 1**
**WILCOX v. DOC**



**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the Assistant General Counsel for**
**Employment, Litigation, and Information**
Washington, DC  20230

January 3, 2022

*Via email to jr@ jtrlaw.com*

Johnny Robertson
Robertson Rubens & Associates
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103

Re: Administrative claim for injuries suffered by your client Stephen A. Wilcox

Dear Mr. Harrison:

  On December 1, 2021, we received your client's claim under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-80, seeking $4,500,000 for alleged personal injuries suffered in connection with an investigation of Mr. Wilcox and termination of his employment by the Department of Commerce.

  Because your administrative tort claim concerns employment actions and does not properly fall under the FTCA, your claim must be denied. I am required by 28 C.F.R. § 14.9(a) to inform you that if you are dissatisfied with this determination you may file suit in an appropriate U.S. District Court not later than six months after the date of mailing of this notification of denial. See 28 U.S.C. § 2401(b).

  If you have any questions, please contact Levi Jones, the staff attorney assigned to this matter, at 202-482-4667 or ljones2@doc.gov.

     Sincerely,


     Megan Heller
     Chief, General Litigation Division

EXHIBIT 2
WILCOX v. DOC

## RESOLUTION AGREEMENT

1.      **PARTIES.**  The parties, Stephen A. Wilcox (Employee) and the U.S. Department of Commerce (Agency), through the undersigned, voluntarily enter into this Resolution Agreement (Agreement), to resolve all existing matters concerning Employee's employment with the Agency.

2.      **EMPLOYEE.**  In consideration of the Agency taking the actions described in Paragraph 3 below, Employee agrees to:

        a.      Voluntarily resign from his employment with the Agency, effective February 7, 2020, should the Agency's Office of Security not issue a favorable security clearance determination by that date. Employee will do this by completing Part (E) of the attached SF-52 and submitting it to the Agency at the time of his signature of this Agreement. Employee agrees that the reason for his resignation will be "For Personal Reasons." By signing this Agreement, Employee acknowledges that his decision to resign is voluntary and irrevocable.

        b.      Not apply for or accept any positions with the Agency, its Bureaus and/or activities, including but not limited to the Bureau of Industry and Security, in the future. If Employee applies for employment in violation of the Agreement, and the Agency hires him, the Agency, at its sole discretion, may terminate or remove (as appropriate) him immediately. Employee further agrees to voluntarily waive all appeal rights he has and not to litigate in any forum, judicial or administrative, any claims arising from a termination or removal pursuant to this paragraph. *NOTHING IN THIS AGREEMENT SHALL PREVENT EMPLOYEE FROM OBTAINING EMPLOYMENT WITH A CONTRACTOR OF THE AGENCY.* *SAW 12/6/19* *JDS 12*

        c.      WAIVER.  Waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any claims, demands, grievances, appeals, complaints, challenges, or causes of action, which Employee has or may have, arising from his employment with the Agency. Employee specifically waives any and all rights to file an appeal with the Merit System Protection Board. Further, Employee waives any and all rights and claims arising under the Age Discrimination in Employment Act, 29 U.S.C. § 633a et seq., as amended by the Older Workers' Benefit Protection Act, the Rehabilitation Act, 29 U.S.C. § 791 et seq., as amended, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., as amended, 5 U.S.C. § 7116, 5 U.S.C. § 7513 and 5 C.F.R. Part 752. This release includes but is not limited to a release of any right to administrative, judicial, or congressional relief, or any other type of relief, or of any claim to back pay, attorneys' fees and costs, or other type of compensation, except what is specifically set forth in paragraph 3, below. However, by entering into this Agreement, Employee does not waive rights or claims that may arise after the effective date of the Agreement.

Initials:

_____ Employee                                    _____ Management Official

Page 1 of 3

3.    **AGENCY.**  In consideration of Employee taking the actions described in Paragraph 2, above, the Agency agrees to process Employee's voluntary resignation effective February 7, 2020, should the Agency's Office of Security not issue a favorable security clearance determination by that date.  Should the Agency's Office of Security issue a favorable security clearance determination by that date, the Agency will not process Employee's request for a voluntary resignation and Employee will remain employed by the Agency.

4.    **NON-ADMISSION.**  This Agreement does not constitute an admission by any party of any wrongdoing.  Rather, the Agreement reflects the parties' interest in reaching an agreement to the satisfaction of all parties.

5.    **NOT PRECEDENTIAL.**  The parties agree that this Agreement has no precedential effect.  Neither the Agreement, nor any term(s) herein may be used as a basis, by any person(s), to justify similar terms in any subsequent matter.  This Agreement shall not be used, cited, or relied upon by any party in connection with any other judicial or administrative procedure.

6.    **NON-DISCLOSURE.**  The parties agree to keep the nature and terms of this Agreement confidential.  The terms of the Agreement may not be disclosed to any person or entity beyond the persons signing below, except to the Employee's spouse as applicable, as required by law, as necessary to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction.  Nothing in this agreement shall limit the disclosure of any information by personnel of the Agency's Office of Inspector General in the conduct of their official duties.

These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this Agreement and are controlling.

7.    **EFFECT OF SIGNATURE.**  By signing this Agreement, Employee agrees that Employee has read and understands the entire Agreement, the effect(s) of each provision, and the waivers set forth in Paragraph 2, above, and that Employee has signed this Agreement voluntarily and was in no way coerced.

8.    **TOTALITY OF AGREEMENT.**  This Agreement constitutes a fair, full, and final resolution of all aspects of these allegations and contains all terms and conditions of the

Initials:

_____Employee                    _____Management Official

Page 2 of 3

Agreement between the parties.  No other conditions or assurances, expressed or implied, are included.

9.      **JOINT PRODUCT.**  This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

10.     **EFFECTIVE DATE.**  This Agreement becomes effective when the Agreement is fully executed by the signatories designated below to include all concurrences.

11.     **RIGHT TO REPRESENTATION.**  Employee is aware of his right to representation by an attorney or representative in this matter and is hereby encouraged to have an attorney or representative review this Agreement prior to signing.

**FOR THE EMPLOYEE:**                        **FOR THE AGENCY:**


Stephen Wilcox             Date             John Sonderman              Date
Employee                                    Management Official


**CONCURRENCE:**


Tomeji Hawthorne           Date
Office of Human Capital Services


_____   _____
Adam Chandler             Date
Deputy Chief, Employment and Labor Law Division


Initials:

_____Employee                           _____Management Official

**EXHIBIT 3**
**WILCOX v. DOC**

MARIA CANTWELL WASHINGTON CHAIR

AMY KLOBUCHAR, MINNESOTA
RICHARD BLUMENTHAL CONNECTICUT
BRIAN SCHATZ HAWAII
EDWARD MARKEY MASSACHUSETTS
GARY PETERS MICHIGAN
TAMMY BALDWIN WISCONSIN
TAMMY DUCKWORTH ILLINOIS
JON TESTER MONTANA
KYRSTEN SINEMA ARIZONA
JACKY ROSEN NEVADA
BEN RAY LUJAN, NEW MEXICO
JOHN HICKENLOOPER COLORADO
RAPHAEL WARNOCK GEORGIA

ROGER WICKER MISSISSIPPI
JOHN THUNE SOUTH DAKOTA
ROY BLUNT MISSOURI
TED CRUZ TEXAS
DEB FISCHER NEBRASKA
JERRY MORAN KANSAS
DAN SULLIVAN ALASKA
MARSHA BLACKBURN TENNESSEE
TODD YOUNG INDIANA
MIKE LEE UTAH
RON JOHNSON WISCONSIN
SHELLEY MOORE CAPITO WEST VIRGINIA
RICK SCOTT FLORIDA
CYNTHIA LUMMIS WYOMING

DAVID STRICKLAND, MAJORITY STAFF DIRECTOR
JOHN KEAST, REPUBLICAN STAFF DIRECTOR

# United States Senate

COMMITTEE ON COMMERCE, SCIENCE,
AND TRANSPORTATION

WASHINGTON, DC 20510–6125

WEBSITE: https://commerce.senate.gov

May 17, 2021

The Honorable Peggy E. Gustafson
Inspector General
U.S. Department of Commerce
1401 Constitution Ave N.W.
Washington, DC 20230

Dear Inspector General Gustafson:

Thank you for the documents you provided pursuant to my letter dated March 15, 2021. Your document production in response to my request, however, remains incomplete. In particular, the productions did not include the primary report detailing your office's recently completed inquiry into the Investigations and Threat Management Service (ITMS) at the Department of Commerce, which is directly related to my ongoing oversight effort.

My frustration emanates not only from the incomplete document production but also the process by which your office processed my request. When I submitted my original request, your staff cited a Department of Justice advisory opinion that effectively allows Ranking Member oversight requests to be ignored.[1] While my legal staff disagrees with the opinion's conclusions, they agreed to receive any documents in the most expeditious manner with assurance of fair treatment and maximum transparency. Unfortunately, this did not happen.

I serve as the Ranking Member of the committee with primary jurisdiction over the Department of Commerce, and until a few months ago I served as the committee's Chairman. Titles change nothing, however, regarding my constitutional ability to request and receive documents from the Executive Branch under my responsibilities of providing effective oversight of the Federal Government as an elected member of the United States Senate.

Even if some standard is deemed useful for prioritizing requests to the Executive Branch from members of Congress, Offices of Inspectors General are unique. Congress established them to help the people's elected representatives provide additional oversight, regardless of the chamber in which the requesting member serves or the political party he or she represents. For this reason, congressional oversight requests should not be processed under the Freedom of Information Act (FOIA), particularly when the request is made in good faith by a ranking member of a congressional committee, who often employs a specialized staff specifically to conduct oversight.

---

[1] *See* Authority of Individual Members of Congress to Conduct Oversight of the Executive Branch, 41 Op. O.L.C. (2017).

Setting these arguments aside, you promised in your opening statement at your confirmation hearing to be Inspector General of the Department of Commerce on May 10, 2016, to "make it a priority to maintain a good working relationship with this Committee, Congress as a whole, the Secretary, and others."[2] Even more, you answered "yes" when the committee's questionnaire asked, "[w]ill you ensure that your department complies with deadlines for information set by congressional committees?"

My ongoing investigation into misconduct at the ITMS has revealed that your Office reviewed similar claims as early as 2017. It seems the reviews by your office lacked the veracity to identify the unlawful conduct that has plagued the Department for more than a decade. This information suggests a continuation of past poor performance, which is a grave disservice not only to Department employees but also the taxpaying American public.

I implore you to provide me with your Office's report into misconduct at the ITMS immediately. Collaboration between Congress and OIGs is imperative to perform effective oversight, and limiting access to important documents like this report only obstructs that shared goal.

Sincerely,

Roger F. Wicker
Ranking Member
Commerce, Science, and Transportation Committee

---

[2] *Nomination of Hon. Peggy E. Gustafson, to be Inspector General for the Department of Commerce*, Before the S. Comm. on Commerce, Sci., and Transp., 114 Cong. 1 (2016) Statement of Peggy E. Gustafson, *available at* https://www.commerce.senate.gov/services/files/06F5BB24-1A17-4C8E-BB27-EF464AF880A1.

**EXHIBIT 4**
**WILCOX  v. DOC**



Steve Wilcox <stevewilcox40@gmail.com>

---

## FOIA Request DOC-OS-2021-000767 Submitted

**no-reply@foiaonline.gov** <no-reply@foiaonline.gov>                    Tue, Jan 19, 2021 at 2:23 PM
To: stevewilcox40@gmail.com

This message is to confirm your request submission to the FOIAonline application: View Request. Request information is as follows:

- Tracking Number: DOC-OS-2021-000767
- Requester Name: Stephen Wilcox
- Date Submitted: 01/19/2021
- Request Status: Submitted
- Description: Copy of the entire investigative case file, including but not limited to:

  1) Details regarding how the investigation against me was initiated,

  2) Copy of recorded audio of my interview with members of OSY in 2018,

  3) Copy of any and all investigative action reports,

  4) Copy of all Reports of Investigation(s) or any other investigative report,

  5) Copy of reports detailing interviews, written or audio recorded, with persons within the Department of Commerce,

  6) Copy of interviews, written or audio-recorded with persons not employed by the Department of Commerce,

  7) Copy of any and all other documents not listed above but relevant to the OSY investigation against me,

  8) Copy of all email correspondence between OSY (George Lee and the OSY Investigators) and the General Counsel's Office, between OSY and BIS leadership (John Sonderman, Doug Hassebrock, Nasir Khan, and/or anyone else in BIS), between BIS leadership and the Department of Commerce General Counsel's Office,

  9) Copy of all non-disclosure agreements signed by interviewees,

  10) Copy of all agent's notes,

  11) Copy of the status of my security clearance as a result of this investigation.

  (See Attached Request)

From: <admin@foiaonline.gov>
Date: Tue, Jan 11, 2022 at 3:18 PM
Subject: FOIA Fee Waiver Disposition Reached for DOC-OS-2021-000767
To: <stevewilcox40@gmail.com>

Your request for Fee Waiver for the FOIA request DOC-OS-2021-000767 has been determined to be not applicable as the request is not billable. Additional details for this request are as follows:

- Request Created on: 01/19/2021
- Request Description: Copy of the entire investigative case file, including but not limited to:

    1) Details regarding how the investigation against me was initiated,

    2) Copy of recorded audio of my interview with members of OSY in 2018,

    3) Copy of any and all investigative action reports,

    4) Copy of all Reports of Investigation(s) or any other investigative report,

    5) Copy of reports detailing interviews, written or audio recorded, with persons within the Department of Commerce,

    6) Copy of interviews, written or audio-recorded with persons not employed by the Department of Commerce,

    7) Copy of any and all other documents not listed above but relevant to the OSY investigation against me,

    8) Copy of all email correspondence between OSY (George Lee and the OSY Investigators) and the General Counsel's Office, between OSY and BIS leadership (John Sonderman, Doug Hassebrock, Nasir Khan, and/or anyone else in BIS), between BIS leadership and the Department of Commerce General Counsel's Office,

    9) Copy of all non-disclosure agreements signed by interviewees,

    10) Copy of all agent's notes,

    11) Copy of the status of my security clearance as a result of this investigation.

    (See Attached Request)
- Fee Waiver Original Justification: 3. This request is for personal purposes, and not for any commercial use. I request a waiver of fees according to 15CFR Section (I) (ii) Disclosure of the information is not primarily in the commercial interest of the requester. If necessary, I agree to pay up to the $25 processing fee, if the costs exceed the two hours of search time and 100 pages of duplication costs for which I am entitled not to be charged. Please notify me in advance if the fees exceed the $25 amount and if my request for waiver of fees is denied.

    (See attached)
- Fee Waiver Disposition Reason: N/A

EXHIBIT 4, cont'd

# DOC-OS-2021-000767 Request Details

    

Submitted    Evaluation    Assignment    Processing    Closed

## Request Information

| | |
|---|---|
| **Full Name** | Under Agency Review |
| **Organization** | Under Agency Review |
| **Fee Category** | N/A |
| **Date Submitted** | 01/19/2021 |
| **Estimated Date of Completion** | 03/08/2021 |
| **Final Disposition** | Undetermined |

## Description

The description of this request is under agency review.

## Released Records

| Download | Title | Size (MB) | File Type | Release Date |
|---|---|---|---|---|
| | | No records have been released yet. | | |

**EXHIBIT 5**
**WILCOX v. DOC**
**BEIJING CHINA**
**CONTRACT / APPOINTMENT**



DEPARTMENT OF COMMERCE

⌂ Dashboard                                                                                    ↑ Return to USAJOBS

Welcome, STEPHEN WILCOX 👤

## Applications

All    Complete    Incomplete

| Announcement Number | Application Status | Vacancy Status | Comments | Actions |
|---|---|---|---|---|
| Position Title | | | | |
| Regional Criminal Investigator (Export Control Officer) ITA-FSHR-2019-0008 | **Grade 01** You have been selected for the position. ⊘ You have answered all the required questions for this grade. | No longer accepting applications | **Grade 01**: No Comment | Update Documents Download Your Application |

Show [25 ▾] results per page   GO

FIRST   PREVIOUS   NEXT   LAST

Note: Adobe Acrobat Reader is required to view PDF files.

POWERED BY MONSTER®

AGENCY FINANCIAL REPORT  |  COMMENT POLICY  |  COMMERCE ARCHIVE  |  EEO POLICY  |  FOIA  |  GOBIERNOUSA.GOV  |  IMPROPER PAYMENTS
|  INFORMATION QUALITY  |  INSPECTOR GENERAL  |  NO FEAR ACT  |  PLAIN LANGUAGE  |  PRIVACY POLICY  |  USA.GOV  |  WHISTLEBLOWER PROTECTION
|  WHITEHOUSE.GOV

This is a Federal job application system. Providing false information, creating fake IDs, or failing to answer all questions truthfully and completely may be grounds for not hiring, for disbarment from Federal employment, or for dismissal after the applicant begins work. Falsifying a Federal job application, attempting to violate the privacy of others, or attempting to compromise the operation of this system may be punishable by fine or imprisonment (US Code, Title 18, section 1001).

  

SW   Help   Search

# Regional Criminal Investigator (Export Control Officer)

DEPARTMENT OF COMMERCE

Department of Commerce - Agency Wide

Reviewing applications

 Help

**Open & closing dates**

🕐 05/15/2019 to 05/30/2019

**Service**

Excepted

**Pay scale & grade**

FP 01

**Salary**

$127,424 to $165,649 per year

**Appointment type**

Term - Full-time - Temporary Initial Appointment of 2 years. May be extended but not to exceed 5 years.

**Work schedule**

Full-time - Excepted Service - Temporary

# Location

 Help

1 vacancy in the following location:

 **Beijing, China**
1 vacancy

**Relocation expenses reimbursed**

Yes Relocation to Beijing, China and return to U.S. Continuing Service Agreement required.

**Telework eligible**

No

# This job is open to

❓ Help

 **Federal employees - Excepted service**
Current excepted service federal employees.

 **Internal to an agency**
Current federal employees of this agency.

## Clarification from the agency

This vacancy announcement is open to current Department of Commerce, Bureau of Industry and Security employees.

This job announcement has closed

🖶 Print

**Announcement number**

ITA-FSHR-2019-0008

**Control number**

**Duties**

 Help

# Summary

The incumbent will serve as a Bureau of Industry and Security (BIS) Commercial/Export Control Officer and provide support for all BIS initiatives. The incumbent will travel frequently conducting BIS end use checks in the region of their respective offices. The incumbent must be a current Special Agent with the U.S. Department of Commerce, Bureau of Industry and Security. Ability to speak Chinese is not required, but is preferred.

<div style="border:1px solid">

**Learn more about this agency**

</div>

# Responsibilities

As an Export Control Officer, the incumbent has region-wide responsibility for implementing and reporting on all BIS programs, including those relating to dual-use and certain munitions export controls, non-proliferation and anti-terrorism.  The incumbent is responsible for issues covered under, inter alia, the Export Control Reform Act (ECRA) of 2018, the Export Administration Regulations (EAR), the International Emergency Economic Powers Act (IEEPA), the Fastener Quality Act, the Chemical Weapons Convention Regulations, and related export control laws.

The incumbent will serve as a Criminal Investigator responsible for investigating actual or alleged violations of the EAR from the point of suspicion or receipt of substantive allegation of violation to the conclusion of resulting criminal judicial process or administrative proceedings. As Regional Criminal Investigators, ECO duties will include liaising with U.S. Government law enforcement officials at post, building and maintaining relationships with host nation law enforcement officials, and providing investigative support to BIS HQ and field offices as appropriate by the region.

Specifically, the incumbent:

Provides support for all Bureau of Industry and Security (BIS) activities, including U.S. export control issues and host country export control development that will typically include bilateral information exchanges by U.S. government agencies and their host Government counterparts.

Works with host government officials and local businesses to provide information and appropriate training in order to facilitate understanding of U.S. dual-use export control laws and regulations.

Provides export control expertise to post by supporting senior U.S. Embassy officials with current information on U. S. and multilateral export control norms and practices.

Conducts pre-license checks and post-shipment verifications on U.S. origin items to facilitate EAR compliance.

Coordinates and supports U.S. export enforcement and export control programs.

Supports Trade Center programs and activities, such as trade fair exhibits, trade missions and other trade promotion programs as related to Export Controls and with the coordination of BIS HQ.

## Travel Required

50% or less - Frequency of travel will vary. These positions cover a wide area of responsibility to include mainland China and South Korea.

**Supervisory status**

Yes

**Promotion Potential**

None

**Job family (Series)**

1811 Criminal Investigation